**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | | |
|---|---|---|
| **IN THE MATTER OF** | : | **CIVIL ACTION NO. 12-2431** |
| **TenX Biopharma, Inc.** | : | |
| | : | **BANKRUPTCY NO. 10-18968** |

_____

**DuBOIS, J.**                                                                                    **August 20, 2012**

**M E M O R A N D U M**

## I.      INTRODUCTION

This is a bankruptcy appeal.  Debtor-in-possession TenX Biopharma, Inc. ("TenX")

appeals from a decision of the United States Bankruptcy Court for the Eastern District of

Pennsylvania allowing the severance claim of TenX's former Chief Operating Officer ("COO"),

Chia Chia Sun.  TenX contends that the Bankruptcy Court interpreted Sun's employment

agreement erroneously.  For the following reasons, the Court affirms the ruling of the

Bankruptcy Court.

## II.      BACKGROUND

TenX is a pharmaceutical company that developed zanolimumab, "an investigational,

late-stage monoclonal antibody cancer therapy targeting T-cell lymphomas."  (TenX BioPharma

grants Emergent BioSolutions rights to zanolimumab, News-Medical (June 6, 2011),

http://www.news-medical.net/news/20110606/TenX-BioPharma-grants-Emergent-BioSolutions-

rights-to-zanolimumab.aspx (last accessed August 10, 2012).)  TenX hired Sun as its Chief

Corporate Officer ("CCO") on February 1, 2010, although her title later changed to COO.  (Feb.

21, 2012, Hr'g Tr. ("2/21/12 Tr."), TenX Br. App. ("App.") Ex. D, at 25–26.)  When she was

hired, Sun executed an employment agreement ("Agreement") dated February 1, 2010.[1]
(Agreement, App. Ex. C.)  The Agreement was for a one-year term to end on February 1, 2011,
with a possible extension if Sun and TenX agreed.  (Agreement ¶¶ 3–4.)  Sun was to receive an
annual salary of $250,000 to be paid monthly.  (Id. ¶ 5.)  The Agreement remained in effect
notwithstanding Sun's change in title from CCO to COO.  (2/21/12 Tr. 28.)

### A.      The Employment Agreement

The Agreement is governed by Delaware law.  (Agreement ¶ 12.)  The issue in this
appeal involves paragraph six of the Agreement, which is titled "Termination of Employment."
The prefatory clause to that paragraph states, in relevant part, that "Employee's employment
shall be terminated and Employee shall have a Separation from Service upon the occurrence of
any one or more of the following events."  (Id. ¶ 6.)  Paragraph six contains five subsections
titled as follows: Termination Without Cause, Resignation by Employee, Termination for Cause,
Termination Upon Death, and Termination Upon Disability.  This appeal implicates the
subsections for Termination Without Cause and Resignation by Employee.

The Termination Without Cause subsection states, in relevant part:

> (a) Termination Without Cause.  Company's provision of written
> notice terminating employment hereunder without cause for any
> lawful reason or for no reason.   Upon such Termination of
> Employment, Employee shall have a Separation from Service on
> the date of Company's provision of such written notice and
> Company's sole obligation shall be:
>
> (i) to continue paying Employee, at a rate equal to Employee's
> Salary at the time of termination and at the same time and in the
> same manner as Employee would have received such Salary if
> termination had not taken place, for a period of one (1) year,
> provided if the Employee accepts full time employment subsequent
> to such termination the period will end upon such acceptance,

---

[1] The Agreement is countersigned by the "President" of TenX; the name of the countersigner is
not in the record, and the signature is illegible.  (App. 19.)

provided in any event such period will not be reduced to less than six (6) months.

. . .

Provided, however, that (A) Company shall not be obligated to make any payment under this Paragraph 6(a) until Employee shall have delivered to Company a release of all claims in form and substance reasonably satisfactory to Company and the release shall have become effective and irrevocable under all applicable laws (hereinafter the "Release") and (B) provided further that with respect to each payment under this Paragraph 6(a), Employee shall forfeit such payment, and Company shall have no obligation to make such payment to Employee, even if such Release is thereafter delivered by Employee to Company, if Employee shall fail to deliver the Release to Company on or before the last day of the taxable year of Employee in which Company would have been obligated to make such payment to Employee under this Paragraph 6(a) if Employee had delivered such release to Company during such taxable year.

(Id. ¶ 6(a).)

The Resignation by Employee subsection states, in relevant part:

Employee's employment shall be terminated and Employee shall have a Separation from Service on the 30th day following Employee's provision of written notification to Company of Employee's intention to resign employment for any lawful reason or for no reason.  Upon any such termination pursuant to this Paragraph 6(b), Company shall have no further obligations to Employee (including severance or otherwise) hereunder except to pay Employee's regular salary and benefits up to the date of termination.  Notwithstanding the foregoing, Company may, in its sole discretion, make such resignation effective earlier than any notice date and in such event Company shall have no further obligations to Employee (including severance or otherwise) hereunder except (i) to pay Employee's regular salary and benefits up to any such earlier effective date of termination and Separation from Service, and (ii) to pay Employee's then current Salary at the time of such termination and Separation from Service, at the same time and in the same manner as Employee would have received such Salary if such termination had not taken place, for any period of time from any such earlier effective date up to the date on which such termination and Separation from Service would have taken

place if Company had not exercised its sole discretion hereunder to
make such resignation effective earlier than any notice date.

(Id. ¶ 6(b).)

The Agreement further states that it "may be modified only by written agreement signed
by Employee and Company."  (Id. ¶ 14.)

### B.     The Events of August 2010

On August 9, 2010, Sun and six other TenX employees sent a letter with the subject
heading "Collective Notice of Resignation" to TenX's Interim Chief Executive Officer, Moishe
Bodner; TenX's President, Asher Nathan; and TenX's Chief Financial Officer, Robert Harrow.
(Resignation Letter, App. Ex. E, at 1.)  In the Resignation Letter, the employees stated, "Please
be advised that the undersigned TenX management is, per employment agreement, submitting a
two-week notification of their intent to resign from [TenX]."  (Id.)  The employees wrote that
they believed that TenX "lack[ed] a clear comprehensive financial and business plan to move
forward . . . as well as a viable strategy to bring zanolimumab to market and the patients who
need it."  (Id.)  The employees advised TenX that, "[d]uring the two-week 'notification' period,"
they would "notify investigators and the necessary regulatory authorities of [their] intent to
protect patients in the study and to maintain control of the drug supply" and "notify advisors,
contracted vendors, and other necessary business contacts of [their] decision to leave TenX."
(Id.)  The Resignation Letter also stated: "Please be aware that we are willing to collectively
rescind our intent to resign should a viable and immediate business solution [sic] that addresses,
directly, our reasons to resign."  (Id.)

TenX personnel exchanged a number of e-mails around the date of the Resignation
Letter.  Sun sent an e-mail—to whom is unclear—on August 10, 2010, at 8:50 p.m., stating,
"We'll schedule a call at 1 pm tomorrow . . . to discuss the shut down process."  (E-mail from

4

Sun dated Aug. 10, 2010, App. Ex. G.)  Sun's e-mail further listed tasks for the "shut down

process" such as "Notify FDA that all activities are stopped."  (Id.)  On August 10, 2010, at 9:13

p.m., Bodner sent an e-mail to Sun that was copied to a number of other individuals, including

all of the signatories to the Resignation Letter.  (E-mail from Bodner to Sun dated Aug. 10, 2010,

App. Ex. G.)  In the e-mail, Bodner asked the recipients to "take note that all drugs and data are

the property of TenX" and stated, inter alia, that "Noone [sic] has any authority to do anything

[Sun] mentions in her e-mail and all actions needed as well as notifications will be taken by the

Company as decided by it's [sic] Board of Directors."  (Id.)

Bodner sent an e-mail to Sun and "Jim"—presumably, Jim Meyer—on August 11, 2010

("Bodner E-mail").  The Bodner E-mail stated, in its entirety:

> Chia Chia and Jim, You are both terminated effective immediately.
> From now do not represent yourselves as having anything to do
> with TenX.  Any such representation will be considered fraudulent
> and the Company will pursue all legal remedies.
> Mo Bodner
> CEO TenX Biopharma
> P.S. TenX will be investigating the compassionate use sale to
> Germany as well as the subsequent payment or lack thereof.
> Sent via Blackberry via AT&T
> Best regards,
> Moe Bodner

(E-mail from Bodner to Sun and "Jim" dated Aug. 11, 2010, App. Ex. G.)

On August 17, 2010, at 4:24 PM, Gardiner F. H. Smith—who replaced Bodner as CEO—

sent an e-mail to Sun, copied to "mobodner@gmail.com," stating, "Chia Chia, You are reinstated

as COO of TenX, effective immediately and with full pay.  Best, Gardiner."  (E-mail from Smith

to Sun dated Aug. 17, 2010, App. Ex. G.)  Three days later, on August 20, 2010, the same seven

individuals who signed the Resignation Letter sent a letter to the TenX Board of Directors

stating:

> We, the undersigned, hereby rescind our resignation effective today, Friday, August 20, 2010, given that a financing plan is in place and that Gardiner Smith has been re-instated as CEO.
>
> Our decision assumes there will be no further financing gaps, failure to pay vendors, terminations without cause and withholding of payroll.  Such actions would put Tenx [sic] out of compliance and require the necessary notifications.
>
> The rescindment does not waive our legal rights and remedies under our respective employment agreements.

(Letter from Sun, et al. to TenX Board of Directors dated Aug. 20, 2010, App. Ex. G.)

Sun's understanding of these events was that she resigned from TenX by sending the Resignation Letter, then TenX terminated her, and then TenX reinstated her.  (Id. at 34–35.)  She testified as follows:

> Q.  So you resigned on August 9th and you contend that you were terminated on August 10th?
> A.  Yes.
> Q.  Who terminated you?
> A.  Mo Bodner.
> Q.  Did you accept the termination?
> A.  Yes.  I was unpaid for the period of August 10th to August 17th.  On August 17th, 2010, I was reinstated by Gardiner Smith, under directions from the board.

(Id.)

Sun further testified that she did not work for TenX between August 10 and August 17, 2010, and was not paid.  (Id. at 35, 37.)  Notwithstanding the references in the Resignation Letter to notifying investigators and regulatory authorities, Sun testified that she never made any such notification and was not aware of any of the other persons who signed the letter having done so.  (Id. at 37.)

Sun remained COO of TenX from August 17, 2010, through TenX's involuntary bankruptcy petition on October 15, 2010, until February 1, 2011.  (Id. at 33, 46.)

C.        **Bankruptcy Court's Ruling**

Sun filed a claim in the Bankruptcy Court for $250,000, asserting that she was entitled to

a full year's worth of severance pay.  (Bankruptcy Court March 23, 2012, Order, App. Ex. A, at

Ex. A.)  Following an evidentiary hearing and oral argument on February 21, 2012, the

Bankruptcy Court ruled from the bench.  The Bankruptcy Court allowed Sun's claim in part and

denying it in part, concluding that Sun was entitled to six months of severance pay—i.e.,

$125,000.[2]  (Id.)  The Bankruptcy Court issued an Order to that effect on March 23, 2012.  The

Bankruptcy Court did not issue a written opinion but explained its ruling from the bench at the

hearing on February 21, 2012.

The Bankruptcy Court concluded that Sun was terminated on August 10, 2010,

notwithstanding her resignation letter of August 9, 2010:

> Just because you terminated the agreement and rehired her, and
> paid her the same wages, doesn't mean that this employment
> agreement covers it.  If you terminated her you terminated her.  If
> you, in fact, rehired her and had an agreement that said we're
> going to—we're—we're reinstating nunc pro tunc the employment
> agreement to August 9th then it would have been a different thing.
> If you'd had—if you'd had her sign a release at that point saying
> I'm not owed severance, I'm not owed anything, you would have
> had a different argument.

(2/21/12 Tr. 60.)

The Bankruptcy Court rejected TenX's argument that Sun was required to provide TenX

with a release of all claims before collecting severance under paragraph 6(a) of the Agreement.

The Bankruptcy Court stated:

> THE COURT: You guys [TenX] drafted the agreement, as far as
> I'm concerned[,] you're responsible for providing a form of release

---

[2] Sun agreed at the hearing that the reduction in severance to six months was appropriate,
(2/21/12 Tr. 65), and her pro se appellee's brief does not argue that she is entitled to the full
$250,000.

7

that is acceptable to you.  You can always accept it from somebody else on other terms in form and substance acceptable to the company.  That doesn't tell me who drafts it.

MR. BECK [COUNSEL FOR TENX]: It doesn't say who drafts it.

THE COURT: That's right.

. . .

THE COURT: You did not establish that she wasn't ready, willing and able to give you a release at any time. . . . I understand it says delivery.  I interpret contracts against the drafter.  The drafter in this case was TenX.  This is not a lawyer.  All she expects is you're going to deliver me a release and I'll have to sign it—everybody understands—because that's the way it works, counsel, you and I both know it.  You don't have individuals drafting the releases that they're giving to their companies.

. . .

THE COURT: She's simply got to be able—ready, willing and able to deliver one, and the question is where is that supposed to come from?  It comes from the company.

. . .

At a minimum you had a duty, I think, to give her a notice that you were not going to pay severance because she hadn't—On December—on January 1st you could have waited—been waiting for her until January 1st of 2011 and handed her a letter saying oh, that's so sad, you didn't give us the release that you're supposed to give us, you don't get your severance

. . .

If they get other jobs then we're going to reduce the severance.  Okay.  She got another job.  It happened to be with TenX.  That's a separate deal, has nothing to do with the severance.  She gets at a minimum the six-month severance.

(Id. at 55–58.)  The Bankruptcy Court, however, stated that its ruling regarding the release was a close one, observing, "Ms. Sun, you won by the skin of your teeth because the argument with regard to the release could go either way, okay?"  (Id. at 123.)

The Bankruptcy Court ordered Sun to execute a release agreement, to be drafted by TenX's counsel.  (Id. at 110, 119–20.)  Sun executed the release on April 4, 2012.  (Release, App. Ex. B.)  TenX then filed this appeal.

## III.   LEGAL STANDARD

A district court reviewing a Bankruptcy Court's judgment on appeal applies a "clearly erroneous" standard to findings of fact.  See Am. Flint Glass Workers Union v. Anchor Resolution Corp., 197 F.3d 76, 80 (3d Cir. 1999).  The Court reviews legal determinations de novo.  J.P. Fyfe, Inc. v. Bradco Supply Corp., 891 F.2d 66, 69 (3d Cir. 1989).

## IV.   DISCUSSION

TenX's appeal presents a single issue: the proper interpretation of the Agreement under Delaware law.  For the reasons set forth below, the Court rejects TenX's arguments and affirms the ruling of the Bankruptcy Court.[3]

### A.   Interpretation of Contracts Under Delaware Law

The Agreement is governed by Delaware law, under which "[t]he proper construction of any contract . . . is purely a question of law," and the court must determine whether the contract contains any ambiguity.  See Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co., 616 A.2d 1192, 1195 (Del. 1992).   Resolution of any ambiguity, however, is a question of fact.  See Eagle Indus., Inc. v. DeVilbiss Health Care, Inc., 702 A.2d 1228, 1232 (Del. 1997); see also Del. Bay Surgical Servs. v. Swier, 900 A.2d 646, 650 (Del. 2006) ("[Review of contract interpretation is] a mixed question of law and fact. Determining the intent of the parties is a question of

---

[3] Because "the facts and legal arguments are adequately presented in the briefs and record and the decisional process would not be significantly aided by oral argument," the Court concludes that oral argument is not necessary.  See Fed. R. Bankr. P. 8012.

fact. . . . Ordinarily, we review <u>de novo</u> a question of contract interpretation as a question of law.").

"A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction.  Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."  <u>Rhone-Poulenc</u>, 616 A.2d at 1196 (citation omitted).  Delaware courts interpret a contract by looking at "what a reasonable person in the position of the parties would have thought it meant."  <u>Id.</u> (citing <u>Steigler v. Ins. Co. of N. Am.</u>, 384 A.2d 398, 400 (Del. 1978)).  A reviewing court starts "by looking to the four corners of the contract to conclude whether the intent of the parties can be determined from its express language," <u>Paul v. Deloitte & Touche, LLP</u>, 974 A.2d 140, 145 (Del. Super. Ct. 2009), but "when there is uncertainty in the meaning and application of contract language, the reviewing court must consider the evidence offered in order to arrive at a proper interpretation of contractual terms," <u>Eagle Indus.</u>, 702 A.2d at 1232.  Courts also consider the parties' course of performance of the contract in interpreting ambiguous terms.  <u>See</u> <u>Sun-Times Media Grp., Inc. v. Black</u>, 954 A.2d 380, 399 (Del. Ch. 2008) ("The parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning." (quoting Restatement (Second) Of Contracts § 202 (1981)).

### B.    Parties' Arguments

TenX challenges the Bankruptcy Court's interpretation of the Agreement on three grounds.  First, according to TenX, Sun resigned and was not terminated by TenX because either the resignation superseded the termination or the August 11, 2010, Bodner E-mail was an acceleration of Sun's resignation.  (TenX Br. 8.)  Under that version of events, because Sun

resigned, she was not entitled to severance.  (<u>Id.</u>)  Second, TenX asserts that, even if Sun were terminated on August 11, 2010, both the termination and Sun's resignation were rescinded just days later.  (<u>Id.</u> at 8–9.)  Under that interpretation, the resignation and termination were nullities because the parties "merely . . . continu[ed] . . . the existing relationship."  (<u>Id.</u>)  Third, according to TenX, even assuming <u>arguendo</u> that Sun was terminated and could have received severance, she forfeited her right to do so by failing to provide TenX with a release of claims prior to December 31, 2010, as the Agreement required.  (<u>Id.</u> at 9–11.)

In her <u>pro se</u> response to TenX's brief, Sun acknowledges that she resigned on August 9 2010, but states that she was terminated on August 10, 2010[4]: "Following written termination by TenX CEO Mo Bodner [on] August 10, 2010, I did not work as COO.  I did not answer emails nor did I answer calls.  I informed staff members of my termination."  (Sun Br. 2.)  She asserts that the August 17, 2010, "rescission" of the termination was a "new hiring" that started a new "one year engagement," and she avers that she was not paid for the period from August 10, 2010, to August 17, 2010.[5]  (<u>Id.</u> at 2–3.)

**C.    Analysis**

The Court will address each of TenX's arguments in turn.

---

[4] Sun refers in her <u>pro se</u> response to August 10, 2010, instead of August 11, 2010.  Because she refers to Bodner's "written termination," the Court understands Sun's references to August 10, 2010, to intend to refer to August 11, 2011, when Bodner e-mailed Sun.

[5] Sun makes additional arguments not addressed by the Bankruptcy Court, such as that she was "terminated by the TenX Board on June 17, 2010," that she "did not receive notice from the company on termination, thus excusing requirement of notice to company on severance on release," and that she was constructively terminated due to violations of labor laws.  (Appellee's Br. 3.)  Because the Court affirms the Bankruptcy Court's ruling based on that court's interpretation of the Agreement, the Court does not reach Sun's additional arguments.

### 1.    Argument that Sun Resigned and Was Not Terminated

First, TenX asserts that the Bankruptcy Court erred in concluding that Sun was

terminated and, instead, should have concluded that she resigned.  The Court rejects this

argument.  The "Resignation by Employee" and "Termination Without Cause" portions of the

Agreement have different immediate effects on the parties' employment relationship.  The

"Resignation by Employee" portion of the Agreement shows that Sun was not yet "terminated"

when she provided notice of her intent to resign on August 9, 2010, because it contemplated that

she would remain an employee for thirty days.  (See Agreement ¶ 6(b) ("Employee's

employment shall be terminated and Employee shall have a Separation from Service on the 30th

day following Employee's provision of written notification to Company of Employee's intention

to resign employment.") (emphasis added).)  By contrast, the "Termination Without Cause"

portion states that termination accomplished pursuant to that clause is immediate.  (See id. ¶ 6(a)

("[Termination Without Cause is] Company's provision of written notice terminating

employment hereunder without cause for any lawful reason or for no reason.  Upon such

Termination of Employment, Employee shall have a Separation from Service on the date of

Company's provision of such written notice.") (emphasis added).)  In the absence of any

language in the Agreement providing otherwise—TenX has not argued that any such language

exists, nor has the Court found any—the Agreement, reasonably construed, provides for

severance payments whenever the employee is terminated without cause, even if she gave notice

of her intent to resign a day earlier.  See Eagle Indus., 702 A.2d at 1232 ("Contract terms

themselves will be controlling when they establish the parties' common meaning so that a

reasonable person in the position of either party would have no expectations inconsistent with the

contract language.").

Moreover, contrary to TenX's argument, the August 11, 2011, Bodner E-mail cannot be construed as an exercise of TenX's discretion to accelerate the effective date of Sun's resignation under paragraph 6(b).  That e-mail stated that Sun was "terminated effective immediately" and should "not represent [herself] as having anything to do with TenX."  Simply stated, if accelerating the resignation was what Bodner intended, he should have used different language from "terminated . . . immediately," and the Bankruptcy Court did not commit clear error in concluding that Bodner intended to terminate Sun, not accelerate her resignation.[6]

As the Bankruptcy Court noted, the parties' actions confirm that they viewed the August 11, 2011, Bodner E-mail as superseding Sun's notice of intent to resign such that the end result was that Sun was terminated for the purposes of severance.  See Sun-Times Media Grp., 954 A.2d at 399 (discussing the importance of course of performance in interpreting a contract).  First, Bodner instructed Sun that she was terminated "effective immediately" and could no longer represent herself as "having anything to do with TenX."  Second, Sun testified that she did not work for TenX between the date on which Bodner terminated her, August 11, 2010, and the date on which she was reinstated, August 17, 2010, and that she was not paid for that period.  (2/21/12 Tr. 34–35, 37.)  Had the parties viewed Sun's resignation as remaining in effect despite the Bodner E-mail, TenX should have continued paying Sun for the contractually required thirty-day period.

Thus, the Bankruptcy Court properly concluded that, under the Agreement, Sun was terminated.

---

[6] As the Bankruptcy Court pointed out, TenX could have avoided the situation in which it finds itself in a number of ways.  TenX could have accelerated Sun's resignation and paid her for only thirty days, it could have documented and pursued a for-cause termination, or it could have required Sun to release her severance claim as a condition of rehiring her on August 17, 2010.

### 2.      Argument that the Termination and Resignation Were Rescinded

TenX next argues that, because Sun "agreed to continue to work for the Debtor [TenX]

under her Employment Agreement after the Debtor's termination and her resignation were

rescinded," the parties intended to institute "merely a continuation of the existing relationship,"

and "no severance could be owed."  (TenX Br. 9.)  On this issue, the Bankruptcy Court reasoned

that, notwithstanding the parties' use of the terms "reinstate" and "rescind," Sun and TenX

entered into a new, unwritten employment agreement on August 17, 2010, with the same terms

as the Agreement.  (See 2/21/12 Tr. 60.)

The Court agrees with the Bankruptcy Court.  TenX cites no authority—either in the

Agreement or in case law—for the proposition that the parties could rescind the resignation or

termination or that TenX was not obligated to pay severance if it later rehired Sun.  In the

absence of any such authority, paragraph 6(a)(i) of the Agreement provides that, when Sun was

terminated without cause, TenX was obligated to pay her severance.  The Bankruptcy Court

properly applied that provision in allowing Sun's claim for six months of severance pay.

Contrary to TenX's argument that the Agreement must have continued in force because, after she

was reinstated, Sun "remained on as the Debtor's chief operating officer . . . and believed she

was entitled to be paid at the rated provided in the [Agreement,]" (TenX Br. 9), it is well

established that parties can, through their conduct, enter into an implied-in-fact contract based on

an earlier contract's terms.  See Capital Mgmt. Co. v. Brown, 813 A.2d 1094, 1097 (Del. 2002)

(discussing parties' rights under an implied-in-fact contract created by the parties' conduct after

expiration of their prior contract); see also Ludens Inc. v. Local Union No. 6 of Bakery,

Confectionery & Tobacco Workers' Int'l Union of Am., 28 F.3d 347, 355–56 (3d Cir. 1994)

("[G]eneral principles of contract law teach us that when a contract lapses but the parties to the

14

contract continue to act as if they are performing under a contract, the material terms of the prior

contract will survive intact unless either one of the parties clearly and manifestly indicates,

through words or through conduct, that it no longer wishes to continue to be bound thereby, or

both parties mutually intend that the terms not survive.").[7]  That the parties later entered a new,

implied agreement with the same terms as their prior written agreement has no bearing on

TenX's obligation to pay Sun six months' severance for terminating her without cause.

        The Court thus rejects TenX's argument that Sun's termination and resignation were

rescinded.

### 3.        Argument that Sun Forfeited Her Severance by Failing to Provide a Release

        TenX's third and final argument is that, even assuming arguendo that Sun was

terminated, she lost her right to collect severance by failing to provide TenX with a timely

release of claims.  (TenX Br. 9–11.)  According to TenX, "the Bankruptcy Court . . . rewrote the

Employment Agreement by ruling that the Debtor was obligated to prepare the release and

provide it to Sun and, by failing to do so, Sun was excused from the express requirement to

deliver the release no later than December 31, 2010."  (Id. at 10.)

        The applicable portion of the Agreement states:

> Company shall not be obligated to make any payment under this
> Paragraph 6(a) until Employee shall have delivered to Company a
> release of all claims in form and substance reasonably satisfactory
> to Company and the release shall have become effective and

---

[7] Luden's, which was decided under Pennsylvania law, is persuasive in resolving this case
because it applied general principles of contract law regarding implied contracts as set forth in,
inter alia, the Restatement (Second) of Contracts Sections 4 and 19(1), Corbin on Contracts
Section 504, and Williston on Contracts Section 6.42.  This Court predicts that the Delaware
Supreme Court would apply those provisions given its reliance on those treatises in other cases.
See Norfolk S. Ry. Co. v. Basell USA Inc ., 512 F.3d 86, 91–92 (3d Cir. 2008) (explaining that a
federal court sitting in diversity must "predict how the [state supreme court] would rule if it were
deciding this case").

irrevocable under all applicable laws (hereinafter the "Release") and (B) provided further that with respect to each payment under this Paragraph 6(a), Employee shall forfeit such payment, and <u>Company shall have no obligation</u> to make such payment to Employee, even if such Release is thereafter delivered by Employee to Company, <u>if Employee shall fail to deliver the Release to Company on or before the last day of the taxable year</u> of Employee in which Company would have been obligated to make such payment to Employee under this Paragraph 6(a) if Employee had delivered such release to Company during such taxable year.

(Agreement ¶ 6(a) (emphasis added).)  Sun did not execute or deliver any such release to TenX until the Bankruptcy Court, as part of its March 23, 2012, Order, directed TenX to have its counsel prepare a release for Sun to complete.  Sun executed the release on April 4, 2012.

In concluding that Sun could recover severance despite not having "delivered to" TenX a release on or before December 31, 2010, the Bankruptcy Court reasoned that TenX was "responsible for providing [to Sun] a form of release that [was] acceptable to [TenX]" and that "[a]ll [Sun] expects is[,] you're going to deliver me a release and I'll have to sign it—everybody understands—because that's the way it works."  (2/21/12 Tr. 55–58.)  The Bankruptcy Court stated that Sun "simply [had] to be able—ready, willing and able to deliver" the release to comply with the Agreement.[8]  (<u>Id.</u>)

The Court rejects TenX's argument.  The Agreement provides that Sun was to "deliver[] to Company a release of all claims <u>in form and substance reasonably satisfactory to Company</u>." (Agreement ¶ 6(a) (emphasis added).)  The Agreement states that Sun is obligated to execute a release and give it to TenX, but the Agreement is silent as to the procedure for preparation of the release and negotiation of its terms.  Therefore, the Court concludes that this portion of the

---

[8] The Bankruptcy Court also stated that it was interpreting the Agreement against TenX because TenX drafted the Agreement.  Notwithstanding the likelihood that TenX either drafted or arranged for the drafting of the Agreement, which is a complex and sophisticated contract, there is no evidence to that effect in the record, and this Court's ruling does not rest on that ground.

Agreement is ambiguous.  See Rhone-Poulenc, 616 A.2d at 1196 (holding that a contract is ambiguous if it is "fairly susceptible of different interpretations or may have two or more different meanings").   To resolve the ambiguity, the Court must look at "what a reasonable person in the position of the parties would have thought it meant."  Id.; see also Eagle Indus., 702 A.2d at 1232 (providing that the contract terms are controlling only when "a reasonable person in the position of either party would have no expectations inconsistent with the contract language").  Under that standard, the Bankruptcy Court did not commit clear error by rejecting TenX's proffered reading—that Sun was required to draft a legal release, predicting the terms and conditions that TenX would require.  To the contrary, a reasonable person in Sun's position would have interpreted the Agreement as requiring her to execute and deliver a release provided to her by TenX.  See Osborn, 991 A.2d at 1160 (defining an "unreasonable interpretation" as one that "produces an absurd result or one that no reasonable person would have accepted when entering the contract").

Accordingly, the Bankruptcy Court did not err in holding that Sun's mere failure to "deliver" a release of claims to TenX on or before December 31, 2010, did not bar her from recovering severance.

## V.   CONCLUSION

For the reasons stated above, the Court affirms the March 23, 2012, Order of the Bankruptcy Court.

An appropriate Order follows.